**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

**CIVIL ACTION NO. 1:17-CV-00145**

```
************************************
VANZ, LLC                          )
                                   )
      Plaintiff                    )
                                   )
      v.                           )
                                   )
PMD FINANCIAL GROUP, LLC,          )
DAVID P. ARSENAULT,                )
PHILIP M. WHITNEY &                )
MARC S. GIGANTE                    )
                                   )
      Defendants                   )
                                   )
************************************
```

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE PORTIONS OF THE AFFIDAVIT OF THOMAS MESCE AND THE PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

NOW COME the Defendants and respectfully file this Memorandum in Support of its request that this Honorable Court strike certain assertions that are made in the Affidavit of Thomas Mesce and the Plaintiff's Memorandum in Opposition to the Defendants' Motion for Summary Judgment. The Defendants state as follows:

1. Pursuant to the seminal case of Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994)[1], a party is not able to resist summary judgment by providing testimony in an Affidavit which contradicts prior deposition testimony. The following assertions should be stricken as running afoul of Colantuoni:

---

[1] "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."

  a) Arsenault "fraudulently altered" and "tampered with" the data, "fraudulently or artificially inflated" numbers within the Chase Portfolio, "laundered the financial data" and "doctor[ed] the data. (See Mesce Aff., ¶¶ 28, 31; Plaintiff's Brief at pp. 6, 9, 12, 18).

However, Mesce admitted in his deposition that he had no evidence to contradict the Defendants' position that it never altered the numbers on the Spreadsheet. (See Defs.' Exhibit 8 at pp. 82:6-85:23 -- Q: [D]o you have any reason to disagree with or dispute that the total of the amount balance column is the sum of the totals of the principal and interest columns on the [Spreadsheet] as shown here? […] A: No, I don't have a disagreement. […] Q: Do you have any reason to disagree that this Excel spreadsheet we're looking at here is any different from the Excel spreadsheet that you were given an opportunity to look at before you purchased? A: No. Q: Okay. And do you know who created this Excel Spreadsheet? A: Don't know. Q: Do you have any reason to dispute that this Excel spreadsheet was provided to PMD by [National Credit Adjusters, LLC]? A: No, I don't know. […] Q: [W]hat is your evidence that this spreadsheet was ever altered? A: I don't know. Q: You don't have any evidence? A: No, I don't have it other than the fact of the statement and the contract that says 21 million from PMD that we subpoenaed that shows 21 million and change…).

  b) "In the instance of the Chase Portfolio, my company paid 2.65% of **the face value, which value was represented by PMD** and Mattia & Associates to be $21,442,947." (See Mesce Aff., ¶ 21). "**Arsenault assured Mr. Mesce, falsely, that the data** appearing in the roster of accounts composing the Chase Portfolio and in what later became the Exhibit C to the contract between Vanz and Mattia **were accurate**." (See Plaintiff's Brief at p. 7).

However, Mesce was asked about all communications that he had with PMD during his deposition and he admitted that there was only a single telephone call with Arsenault and,

when asked what the telephone call consisted of, he testified that it was "just a generic call to see who he was. And that was it. You know, and that this is what they were selling, that they were brokers. Just very generic." (See Defs.' SMF, ¶¶ 27, 32 & Defs.' Exhibit 8 at pp. 69, 75). When further pressed about everything he remembered that Arsenault said on the call, Mesce testified that: "I do remember that I spoke to him. I had him on the phone briefly. They were buying the packages, PMD, and that I'm going to get the backup. And Geisler spoke to me before we answered the phone call, too, that we're doing that. And I was concerned about we were going to get the balances that agreed with the charge-off date from Geisler and all of that. And that's what I was confirming what we were buying, that we're getting statements to back that up, and it would be that amount, you know, that backs it up. That's what we discussed." (See Defs.' Exhibit 8 at pp. 76-77). In sum, despite being directly asked what PMD said to him, he did not testify that PMD or Arsenault made any "representations" or "assurances" and, thus, Colantuoni precludes him from offering such testimony at this stage.

2. Affidavits provided in opposition to a motion for summary judgment must be based on personal knowledge, and not based on hearsay or any other inadmissible evidence. See Fed. R. Civ. P. 56(c)(4); Kenney v. Floyd, 700 F.3d 604, 609 (1st Cir. 2012) ("Fed. R. Civ. P. 56(c)(4) plainly requires that affidavits used to oppose a motion for summary judgment 'must ... set out facts that would be admissible in evidence, and "[i]t is black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted."). Assertions in an Affidavit which are purely speculative are also not competent for purposes of summary judgment. Hostar Marine Transport Systems, Inc. v. U.S., 592 F.3d 202, 207 (1st Cir. 2010). The following assertions should be

stricken for failing to satisfy said requirements in that they contain hearsay, are not based on Mesce's personal knowledge, or are not supported by any record citations:

c) "[Geisler] told me that it was 'about a fifteen million dollar portfolio' of credit card debt, meaning, the face values of the individual debtor accounts composing the portfolio totaled about fifteen million dollars."  (Mesce Aff., ¶ 5).

d) Mr. Geisler told me that another company, PMD Financial Group, was the "'exclusive broker for NCA.'"   (Mesce Aff., ¶ 6).

e) "However, Mattia & Associates' owner, George Mattia, intervened and suggested to me that the portfolio be put in his company's name first and sold to my company through his company, for it was our intention from the start that his company was going to do the collection work on a large portion of the accounts making up that portfolio."  (Mesce Aff., ¶ 7).

f) "[Mr. Mattia] proposed that the portfolio initially be put in his company's name and then transferred to my company because "'it would be more efficient this way.'"  (Mesce Aff., ¶ 8).

g) "Mattia & Associates lacked the financial ability to purchase the portfolio from PMD by itself.  Both Mattia and PMD were depending on my company to furnish sufficient funds, via payment of the purchase price, to enable Mattia to purchase the portfolio from PMD (and, as I later learned, to enable PMD to purchase the portfolio from NCA)."  (Mesce Aff., ¶ 10).

h) "Mr. Geisler announced to me that PMD Financial Group had 'found' an additional six or seven million dollars' worth of debt in the Chase Portfolio."  (Mesce Aff., ¶ 17).

i) "[A]ny debt collector who adds or attempts to collect such interest exposes himself to potential liability under the Federal Fair Debt Collection Practices Act. That fact is widely known within the debt collection industry, and the attorneys in the law firm in New Jersey whom I normally use for collection work have advised me to the same effect."  (Mesce Aff., ¶ 26).

j) "I **believe** that Mr. Arsenault acted in collusion with M. Geisler to bring about this fraud . . . ."  (Mesce Aff., ¶ 29) (emphasis added).

k) "Shortly after the conference call between Mr. Arsenault, Mr. Geisler, and myself, Mr. Geisler phoned me and told me that PMD had 'found another six or seven million dollars' of debt in the portfolio, meaning, the actual face

4

value of the portfolio was (supposedly) around $21 million, rather than the $15 million that I had been told before." (Mesce Aff., ¶ 30).

l) "On such occasions as I did succeed in having substantive discussion with Mr. Geisler, he told me that he would pass along my complaints to PMD and would try to get an explanation for the discrepancy, but he never got back to me with a response. At one point he claimed that PMD had blamed the problem on NCA, or at least had insinuated that NCA was the party who may have been responsible for altering the data, and he said that PMD was going to contact NCA for an explanation." (Mesce Aff., ¶ 33).

m) All references Craig Geisler's May 3, 2016 deposition (Plaintiff's Exhibit 20) which the Court previously ordered was inadmissible in its ruling on the Plaintiff's Motion in Limine. [Docket Entry # 17].

n) "Geisler, representing Mattia and Associates, passed along the misrepresentation [concerning the value of the Chase Portfolio] to Vanz, LLC's principal, Mr. Mesce." (Plaintiff's Brief at p. 6). The Plaintiff cites to page 36 of Arsenault's Deposition; however, such reference contains nothing to support this assertion.

o) "PMD's misrepresentations, in concert with those of its cohorts--Craig Geisler, George Mattia, and Mattia & Associates--went on for months, consisting of several separate misrepresentations as to the value of the Chase Portfolio." (Plaintiff's Brief at p. 16). There is no record citation which supports this allegation. Rather, the Plaintiff alleges that PMD participated in a single telephone call and, at his deposition, Mesce failed to testify to anything substantive that PMD was alleged to have said during such telephone call.

p) "[A] subsequent cover-up consisting of repeated misrepresentations calculated to throw Vanz off the track and to obstruct its attempts to discover the truth." (Plaintiff's Brief at p. 16). While Mesce's Affidavit contains allegations against Mr. Geisler in this regard, there is no record citation to support that PMD engaged in any such "cover-up."

q) "Here, the parties' principals were scattered across the nation, located variously in New Hampshire, Florida, California, and New Jersey, and consequently there were dozens of telephone calls that were made by the defendants herein and their collaborators in furtherance of the fraudulent scheme when they were putting the transaction together." (Plaintiff's Brief at p. 17). There is no record citation to support this claim and, in any event, the Plaintiff only alleges that PMD was involved in a single telephone call.

r) "This is not the kind of thing that Geisler could have concocted by himself; either it was initiated by Arsenault, or he and Geisler colluded with one another, and Arsenault used Geisler as his messenger to communicate this falsehood to Mr. Mesce." (Plaintiff's Brief at p. 18). There is no record citation to support this claim and it is purely speculative.

s) "Arsenault, acting in concert with Geisler and Mattia & Associates fraudulently induced Mr. Mesce to use a wire transfer to convey more than a half-million dollars to Mattia & Associates." (Plaintiff's Brief at p. 18). There is no record citation to support this claim and it is purely speculative.

WHEREFORE, the Defendants respectfully request that this Court strike and not consider the (a) – (s) for purposes of the Defendants' Motion for Summary Judgment.

                                        The Defendants,
                                        By Their Attorney,

/s/ Scott D. Carman

_____
Scott D. Carman NH Bar 19862
Shaevel, Krems, O'Connor & Jackowitz, LLP
141 Tremont Street
Boston, MA 02111
(617) 556-0244
SCarman@skojlaw.com

Dated: August 24, 2018