Vanz, LLC

     v.                                    Civil No.  17-cv-145-LM
                                            Opinion No. 2019 DNH 058
PMD Financial Group, LLC, et al.


# O R D E R

This suit arises out of the purchase by Vanz, LLC ("Vanz") of a portfolio of nonperforming debt from a third party that acquired the portfolio from defendant, PMD Financial Group, LLC ("PMD").  Vanz claims that PMD, through several of its managers (individually named defendants David Arsenault, Philip Whitney, and Marc Gigante), misrepresented the value of the portfolio Vanz purchased, thereby fraudulently inducing Vanz to pay an inflated price.  Defendants move for summary judgment on all of Vanz's claims.  Doc. no. 21.  They also move to strike portions of the affidavit of Thomas Mesce, Vanz's operating member and manager, and portions of Vanz's memorandum in opposition to their motion for summary judgment.  Doc. no. 31.  Vanz objects to both motions.  For the following reasons, defendants' motion for summary judgment and motion to strike are granted in part and denied in part.

**STANDARD OF REVIEW**

A movant is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing the record, the court construes all facts and reasonable inferences in the light most favorable to the nonmovant. Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 115 (1st Cir. 2013).

**BACKGROUND**

The following facts are drawn from the summary judgment record and are not in dispute unless otherwise noted. This suit arises out of a series of transactions among companies in the debt-buying industry. That industry involves a variety of players. Original creditors, such as banks or credit card companies, bundle delinquent accounts into "portfolios" and sell them to companies that buy nonperforming debt. The original creditors have already written off, or "charged-off," those delinquent accounts after exhausting collection efforts, so the sale of the portfolios allows the original creditors to mitigate losses. The debt buyers, in turn, either sell the portfolios to another company or attempt to collect on the debts to make a profit. The debt-buying companies pay pennies on the dollar for

a given portfolio, knowing that a substantial portion of the accounts in the portfolio will be uncollectible. Vanz and PMD are limited liability companies participating in this market: PMD buys and sells portfolios of nonperforming debt and Vanz buys portfolios of nonperforming debt and collects on the accounts.

On October 4, 2011, PMD purchased a portfolio of charged-off Chase Bank credit card debt ("the Chase portfolio") from National Credit Adjusters, LLC ("NCA"), another company in the business of buying and selling debt. The Chase portfolio consisted of 3,932 credit card accounts with delinquent balances. At the time PMD purchased the Chase portfolio from NCA, the face value of that portfolio was approximately $15.8 million. The "face value" of a portfolio of nonperforming debt is "the sum total of all of the individual accounts making up that portfolio." Doc. no. 28-2 at 10. PMD paid 2.5% of that face value ($395,806.78) to NCA for the portfolio.

On October 13, 2011, PMD sold the Chase portfolio to another company in the business of buying and selling nonperforming debt, Mattia and Associates ("Mattia"). Although the portfolio PMD transferred to Mattia was identical to the one PMD received from NCA, the purchase and sale agreement and closing documents for the PMD-to-Mattia transaction represented

that the face value of the Chase portfolio was approximately $21.4 million, not $15.8 million.[1]  Mattia paid PMD a purchase price of $471,744.84, or 2.2% of the $21.4 million face value.

That same day, Mattia sold the Chase portfolio to Vanz. Vanz paid Mattia $568,238.10 for the portfolio, or 2.65% of the $21.4 million face value.  At the closing of that transaction, Vanz received a spreadsheet with information regarding the accounts in the portfolio, including each individual account's balance.

Approximately three or four months later, Vanz received additional supporting documentation for the Chase portfolio. That documentation included the individual credit card charge-off statements generated by Chase Bank, which stated the date the bank had written off the accounts as bad debt and the account balance at that time.  Vanz then compared the bank's underlying charge-off statements with the data appearing on the spreadsheet it was given at the closing.  Vanz contends that, through this comparison, it determined that the face value of the Chase portfolio was actually approximately $15.8 million, not $21.4 million.

---

[1] The precise figures displayed in the purchase and sale agreements and closing documents were $21,442,947.29 and $15,832,271.02, respectively.  Doc. nos. 28-5 at 15, 28-3 at 11, 28-4 at 11.

In May 2012, Vanz sent a demand letter to PMD and Mattia threatening legal action based upon its allegation that the value of the Chase portfolio had been fraudulently inflated. PMD responded, denying that it engaged in any wrongdoing regarding the Chase portfolio.

In March 2013, Vanz filed suit against Mattia, its president, its chief operating officer, "ABC, INC." and "XYZ, LLC" in the United States District Court for the District of New Jersey. Doc. no. 21-18. That complaint alleged claims arising out of Mattia's sale of several portfolios of nonperforming debt to Vanz, including the Chase portfolio. Over two years later, in December 2015, Vanz amended that complaint to add PMD as a defendant. Soon thereafter, PMD filed a motion to dismiss for lack of personal jurisdiction, which the New Jersey District Court granted in June 2016.

In April 2017, Vanz commenced this suit against PMD, Arsenault, Whitney, and Gigante, alleging claims arising out of the Chase portfolio transaction. The crux of the complaint is that Arsenault fraudulently inflated the face value of the Chase portfolio from approximately $15.8 million to $21.4 million and that Arsenault then communicated this misrepresentation to Vanz through Mattia. Doc. nos. 1 at ¶¶ 27-32, 28-1 at 12. Vanz alleges that Arsenault improperly inflated the face value of the

portfolio by including post-charge-off interest (i.e., interest added to the individual account balances after the bank had written off the debt).  Doc. no. 1 at ¶ 31.  Based on these and other allegations, Vanz asserts seven claims against defendants: fraud (Count I); negligent misrepresentation (Count II); breach of contract (Count III) (against PMD only); breach of implied covenant of good faith and fair dealing (Count IV); violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act (Count V); violation of the New Hampshire Consumer Protection Act (Count VI); and piercing the corporate veil (Count VII) (against the individual defendants only).

## DISCUSSION

Defendants move for summary judgment on all seven of Vanz's claims.  They also move to strike portions of Thomas Mesce's affidavit ("Mesce affidavit") and portions of Vanz's memorandum in opposition to their motion for summary judgment ("opposition memo").  The court addresses defendants' motion to strike first.

## I.   Motion to Strike

Defendants move to strike two groups of assertions from the Mesce affidavit and the opposition memo: (1) identified assertions that contradict Mesce's deposition testimony; and (2) identified assertions that are based on inadmissible evidence,

are purely speculative, or that are unsupported by citations to the record.  See doc. no. 31-1 at 1, 3-4.

Defendants first argue that certain assertions in the Mesce affidavit and opposition memo should be stricken under the rule established in Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1 (1st Cir. 1994).  In Colantuoni, the First Circuit held that "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."  Id. at 4-5.  The court's inquiry focuses on whether the responding party is "attempt[ing] to manufacture an issue of fact in order to survive summary judgment."  Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105, 110 (1st Cir. 2006).  Having considered Mesce's affidavit, the opposition memo, and Mesce's deposition testimony, the court cannot conclude that Mesce's affidavit and the assertions in the opposition memo supported by that affidavit clearly contradict his deposition testimony such that it appears he was attempting to manufacture an issue of fact for the purpose of preventing summary judgment.  Defendants' motion to strike on this basis is denied.

Second, defendants argue that the court should strike ten
specific assertions in Mesce's affidavit, six specific
assertions in the opposition memo, and all references to Craig
Geisler's deposition in support of the opposition memo.  Doc.
no. 31-1 at 4-6.  They argue that the identified assertions in
Mesce's affidavit must be stricken because they do not
constitute admissible evidence in that they include hearsay or
are not based on personal knowledge.  See Fed. R. Civ. P.
56(c)(4).  They further contend that the identified assertions
in the opposition memo should be stricken because they are not
supported by citations to the record.

Defendants' motion to strike is granted to the extent that
it seeks to strike references to Craig Geisler's deposition.  A
court may consider only admissible evidence when ruling on a
summary judgment motion.  See Fed. R. Civ. P. 56(c)(2); Quiles
v. Sikorsky Aircraft, 84 F. Supp. 2d 154, 161 (D. Mass. 1999).
As the court held in a prior order, Geisler's deposition
testimony is not admissible at trial.  Doc. no. 17.  Therefore,
the court will not consider it when ruling on the summary
judgment motion.  Further, to the extent that any factual
assertions in the opposition memo are not supported by citations
to the record or any assertions in the affidavit are purely
speculative, the court will disregard them.  See Fed. R. Civ. P.

56(c),(e); Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (observing that, on summary judgment, court "may ignore conclusory allegations, improbable inferences, and unsupported speculation" (internal quotation marks omitted)).

Defendants' motion to strike is otherwise denied. Although it appears that some of the assertions in the Mesce affidavit may be inadmissible hearsay if relied upon for the truth of the matters asserted, they may be admissible for other purposes, such as the effect on the listener. See United States v. Colon-Diaz, 521 F.3d 29, 33 (1st Cir. 2008) ("While an out-of-court statement may be hearsay if offered to prove the truth of the matter asserted, it is nonhearsay if offered for some other purpose, including when offered only for context." (internal quotation marks omitted)); United States v. Cruz-Diaz, 550 F.3d 169, 176-77 (1st Cir. 2008) (observing that out-of-court statements offered for the limited purpose of showing what effect the statement had on the listener are not hearsay). The court bears these rules in mind and limits its review of the record to admissible evidence in deciding defendants' motion for summary judgment.

## II. Motion for Summary Judgment

The court now turns to defendants' motion for summary judgment. Defendants raise two primary arguments: (1) all

Vanz's claims are time-barred by the applicable statutes of limitations; and (2) alternatively, there is insufficient evidence in the record to support any of Vanz's claims.

A. Statutes of Limitations

Defendants argue that they are entitled to summary judgment because Vanz failed to timely file its claims in this court, and the claims are therefore barred by the applicable statutes of limitations. Doc. no. 21-1 at 4. Defendants contend that New Hampshire's three-year statute of limitations for personal actions applies to all Vanz's claims except the RICO claim, which is subject to a four-year limitations period. Id. at 8 n.3.

Vanz does not appear to dispute that New Hampshire's statute of limitations applies to determine whether Vanz timely filed its claims here (other than its RICO claim). See doc. no. 28-1 at 19-25. Vanz also does not appear to dispute that, applying New Hampshire's statute of limitations and the federal RICO statute of limitations, Vanz did not timely file its claims in this court. See id. Instead, Vanz relies on the New Hampshire savings statute, New Hampshire Revised Statutes Annotated ("RSA") § 508:10, to argue that its claims survive their respective limitation periods. See id. at 19.

Before turning to Vanz's argument that RSA 508:10 saves its claims, the court considers whether, without the benefit of the savings statute, Vanz's claims would be time-barred. The statute of limitations for personal actions as well as New Hampshire Consumer Protection Act claims is three years, see RSA 508:4, I, and the statute of limitations for RICO actions is four years, see Rotella v. Wood, 528 U.S. 549, 553 (2000). Vanz purchased the Chase portfolio in October 2011 and discovered the alleged fraudulent inflation of the portfolio's value in January or February 2012. See Black Bear Lodge v. Trillium Corp., 136 N.H. 635, 637-38 (1993) (discussing application of "discovery rule" to toll running of statute of limitations until plaintiff, in exercise of reasonable diligence, "should have discovered the injury and its causal relationship to the act or omission complained of"). Consequently, the statute of limitations ran on Vanz's state law claims (Counts I-IV, VI-VII)—at the latest— in January or February 2015. The limitations period for the RICO claim (Count V) extended, at most, until January or February 2016. This action was not filed until April 2017, well outside of the limitation periods for all Vanz's claims.

Because Vanz's claims are otherwise time-barred, the court turns to Vanz's argument that its claims are saved by RSA 508:10. RSA 508:10, entitled "Second Suit," provides that:

> If judgment is rendered against the plaintiff in an
> action brought within the time limited therefor, or
> upon a writ of error thereon, and the right of action
> is not barred by the judgment, a new action may be
> brought thereon in one year after the judgment.

In practice, RSA 508:10 operates to "save" an action that would otherwise be time-barred. See Berg v. Kelly, 134 N.H. 255, 257 (1991). Its purpose "is to protect the right of diligent plaintiffs to a hearing and a judgment on the merits, and the statute is to be given a liberal interpretation." Rowe v. John Deere, 130 N.H. 18, 23 (1987).

In order to file a second suit under RSA 508:10, a plaintiff must meet five requirements: two that pertain to the first suit and three that concern the second suit. First, plaintiff's first action must have been timely filed. See Berg, 134 N.H. at 257. Second, the first action must have been "dismissed for reasons not barring the right of action or determining it upon its merits." Id. (internal quotation marks omitted). Third, the second suit must be brought within one year of the judgment dismissing the first suit. RSA 508:10; Brady v. Duran, 119 N.H. 467, 470 (1979). Fourth, the second suit must be brought against the same defendant or defendants named in the first action. Rowe, 130 N.H. at 23-24; see also Veale v. Keene Publ'g Corp., 181 F.3d 81 (Table), 1999 WL 525941, at *1 (1st Cir. 1999) ("[T]he tolling rule set out in §

508:10 only applies to the defendants named in the first action.").  Finally, the second suit must be comprised of the same claim or claims plaintiff asserted in the first action. See Moulton-Garland v. Cabletron Sys., Inc., 143 N.H. 540, 543-44 (1999); Milford Q. & C. Co. v. Boston & M.R.R., 78 N.H. 176, 177 (1916); see also Prince v. Metro. Life Ins. Co., No. CIV. 08-CV-471-JL, 2010 WL 988730, at *9 (D.N.H. Mar. 16, 2010) (ruling under RSA 508:10 that plaintiff could not raise a claim for the first time in second suit that had not been raised in the first action); Veale, 1999 WL 525941, at *1 ("[A]s well as limiting § 508:10 to the same parties, the New Hampshire Supreme Court appears to have limited the section to the same cause [of action].").[2]

Before determining whether Vanz has met each of the five requirements, the court must first address a threshold issue of first impression: is the New Hampshire savings statute applicable where the original suit was filed in another state? Although the parties did not raise or brief this precise issue, the court must address it because if the New Hampshire savings statute is not applicable where the original suit was filed in

---

[2] The first three requirements derive from the plain language of the statute, while requirements four and five have been developed by the New Hampshire Supreme Court through case law.

13

another jurisdiction (here New Jersey), none of Vanz's claims
would survive.  Because the New Hampshire Supreme Court has not
addressed this issue, the court must interpret the statute as it
thinks the New Hampshire Supreme Court would interpret it.  See
In re Caron, 82 F.3d 7, 9 (1st Cir. 1996).

When interpreting statutes, the New Hampshire Supreme Court
looks first "to the language of the statute itself, and, if
possible, construe[s] that language according to its plain and
ordinary meaning."  Petition of Carrier, 165 N.H. 719, 721
(2013).  It interprets "legislative intent from the statute as
written and will not consider what the legislature might have
said or add language that the legislature did not see fit to
include."  Id.  It construes "all parts of a statute together to
effectuate its overall purpose and avoid an absurd or unjust
result."  Id.

The court looks first to the plain language of RSA 508:10.
See id.  As stated above, the savings statute provides:

> If judgment is rendered against the plaintiff in an
> action brought within the time limited therefor, or
> upon a writ of error thereon, and the right of action
> is not barred by the judgment, a new action may be
> brought thereon in one year after the judgment.

RSA 508:10.  The plain language of the statute does not require
that the original action be brought in New Hampshire or in "this
jurisdiction."  Nor does it require that the first action be

brought within the time limitations prescribed by New Hampshire
law.  In short, the word "action" is not qualified or modified
in a way that excludes original suits filed outside of New
Hampshire.  To construe the statute as inapplicable where the
original action was filed in another jurisdiction would add
limiting language that the legislature did not include, which
this court may not do.  See Petition of Carrier, 165 N.H. at
721.

Next, in interpreting a statute, the court must "construe
all parts of the statute together to effectuate its overall
purpose."  Id.  The purpose of the savings statute is to ensure
"a diligent suitor the right to a hearing in court until he
reaches a judgment on the merits."  Berg, 134 N.H. at 257
(internal quotation marks omitted).  This statutory purpose
extends to diligent plaintiffs who, through clumsiness or
mistake, caused the dismissal of the first suit.  See Roberts,
140 N.H. at 725 (explaining that benefit of RSA 508:10 does not
depend on "whether the prior judgment of dismissal was based on
any mistake committed by the plaintiff or his counsel");
Milford, 78 N.H. at 178 ("A party is protected although the
technical judgment against him may be due to his own
carelessness or fault." (internal quotation marks omitted)).
The New Hampshire Supreme Court has stated that the statute's

"liberal purpose . . . is not to be frittered away by any narrow construction." Id. (internal quotation marks omitted). Indeed, the New Hampshire Supreme Court has repeatedly given the savings statute a broad construction. See Roberts v. Gen. Motors Corp., 140 N.H. 723, 726-27 (1996) (rejecting argument that legislature intended to limit RSA 508:10 to one application); Doggett v. Town Of N. Hampton Zoning Bd. of Adjustment, 138 N.H. 744, 746 (1994) (holding that RSA 508:10 applies to appeals to superior court from decisions of zoning board of adjustment). Interpreting the savings statute broadly (i.e., to apply when the original case was filed in another jurisdiction) effectuates the statute's purpose by ensuring diligent plaintiffs their day in court, even if they wrongly filed their first suit in another jurisdiction.

Additionally, construing the savings statute as applicable when the original suit was filed in another jurisdiction is consistent with the purpose of statutes of limitations in general. "Statutes of limitations are primarily designed to assure fairness to defendants." Burnett v. New York Cent. R. Co., 380 U.S. 424, 428 (1965). They are specifically designed to ensure "that defendants receive timely notice of actions against them," Roberts, 140 N.H. at 726 (internal quotation marks omitted), and to prevent "the revival of claims that have

16

been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared," Burnett, 380 U.S. at 428.

An action that is timely filed in another jurisdiction gives a defendant actual notice of the claims levied against him.  See Roberts, 140 N.H. at 726 ("[D]efendant was on notice of the charges against it from the day the original suit was filed."); see also Long Island Tr. Co. v. Dicker, 659 F.2d 641, 647 (5th Cir. 1981) ("[G]iven the extremely high probability that the plaintiff will refile in a proper court if the defendant is successful in obtaining the dismissal in the forum of the plaintiff's choice, the defendant has no one but himself to blame if evidence is lost, memories fade, and witnesses disappear.").  Indeed, application of the savings statute in this case would not undermine the purposes of the statute of limitations.  Although the New Jersey action against PMD was dismissed for lack of personal jurisdiction, it put PMD on notice of Vanz's allegations against it regarding the Chase portfolio.[3]  Given RSA 508:10's plain language, the purpose of the statute, and the purpose of statutes of limitations generally, the court concludes that the New Hampshire Supreme

---

[3] Vanz's demand letter, sent in May 2012, also put PMD on notice of Vanz's general allegations.

Court would interpret RSA 508:10 as applicable when the first action was filed in another jurisdiction.

Case law in other jurisdictions is mixed on this precise question. A majority of courts in other jurisdictions that have considered this issue have held that a savings statute does not apply where plaintiff filed the prior action in another state. See, e.g., Andrew v. Bendix Corp., 452 F.2d 961, 963 (6th Cir. 1971) (adopting majority interpretation under Ohio law); Muzingo v. Vaught, 887 S.W.2d 693, 695-96 (Mo. Ct. App. 1994) (adopting majority view and collecting cases in support). While those cases are described as having applied "the majority rule," the Ninth Circuit recognized more than thirty years ago that a "significant and growing minority" of courts have adopted "the more liberal interpretation." Allen v. Greyhound Lines, Inc., 656 F.2d 418, 420 (9th Cir. 1981) (recognizing majority and minority views and adopting minority interpretation); see also Stare v. Pearcy, 617 F.2d 43, 44-45 (4th Cir. 1980) (acknowledging majority and minority interpretations, adopting minority view, and describing it as a "liberal construction" consistent with the purposes of the savings statute); Templer v. Zele, 803 P.2d 111, 112 (Ariz. Ct. App. 1990) (recognizing majority rule and cases in support, but collecting cases demonstrating that the "trend . . . appears to be otherwise").

Courts that have adopted the "minority" view have relied upon at least four policy justifications supporting their interpretations of analogous savings statutes:  First, savings statutes are remedial in nature and therefore require a liberal construction.  See, e.g., Long Island Tr. Co., 659 F.2d at 647; LaBarge, Inc. v. Universal Circuits Inc., 751 F. Supp. 807, 811 (W.D. Ark. 1990).  Second, the minority interpretation of savings statutes is consistent with the purpose of the statute of limitations generally, i.e., to put defendants on timely notice of the claims against them.  See, e.g., Long Island Tr. Co., 659 F.2d at 647; Templer, 803 P.2d at 112.  Third, virtually all states have savings statutes and no policy of the forum state is advanced by not applying the statute to actions filed in sister states.  See Prince v. Leesona Corp., 720 F.2d 1166, 1169 (10th Cir. 1983).  Finally, to the extent states are concerned with forum shopping, it is unlikely that this problem is impacted substantially by either interpretation of the savings statute.  See Allen, 656 F.2d at 422-23.  The court concludes that the New Hampshire Supreme Court would find these policy justifications persuasive, especially the first two.

For all these reasons, the court concludes that the New Hampshire Supreme Court would construe RSA 508:10 as applicable when the original action was filed in a foreign jurisdiction.

Having resolved this threshold issue, the court turns to the
five requirements a plaintiff must meet to receive the benefit
of the New Hampshire savings statute.

### 1. First action must be timely filed

The first requirement is that plaintiff's original action
must have been timely filed.  See Berg, 134 N.H. at 257.  Where,
as here, the original action was filed in another jurisdiction,
there is an open question as to what law applies to determine
whether the first action was timely filed: the law of New
Hampshire or the law that would have been applicable in the
jurisdiction where the first action was filed.  PMD advocates
for the former interpretation of the statute, Vanz for the
latter.[4]  Once again, this issue is one of first impression in
New Hampshire.  Therefore, the court interprets the statute as
it thinks the New Hampshire Supreme Court would interpret it.
See In re Caron, 82 F.3d at 9.

Looking first to the plain language of the statute, it
contains no express requirement that the first action be brought

_____

[4] As will be discussed further below, applying New
Hampshire's statute of limitations, as PMD argues, would result
in all Vanz's claims in the first action being untimely.  On the
other hand, applying the New Jersey statute of limitations, as
Vanz urges, would operate to make all the claims in Vanz's first
action timely, thereby satisfying the first requirement of the
New Hampshire savings statute.

within the time limitations provided by New Hampshire law.  Cf. Mo. Rev. Stat. § 516.230 (allowing commencement of second suit where the first suit was brought within the time prescribed by specific provisions of Missouri law).  Rather, the plain language of the statute requires that the first action be "brought within the time limited therefor."  RSA 508:10.  Using the dictionary for guidance, see K.L.N. Constr. Co., Inc. v. Town of Pelham, 167 N.H. 180, 185 (2014), the plain meaning of "therefor" is "for that," Webster's Third New International Dictionary 2372 (unabridged ed. 1993); see also Black's Law Dictionary 1701 (10th ed. 2014) (defining "therefor" as meaning "for that thing or action").  The phrase "brought within the time limited therefor" modifies the word "action."  See Roberts, 140 N.H. at 727.  Read together in the context of the statute, this language provides that the original action must have been brought in the time limited for that action.  This generic language supports a construction of the statute that requires the first action to be timely filed according to the law applicable in that first action—whether it be extra-jurisdictional law or New Hampshire law.

Furthermore, requiring that the first action be timely according to the law of the jurisdiction where it was filed effectuates the statute's liberal purpose.  See Petition of

Carrier, 165 N.H. at 721 (court must construe statute to "effectuate its overall purpose").  The opposite interpretation would result in a narrow construction: plaintiffs who wrongly file in another jurisdiction, believing in good faith that they have timely filed according to the applicable statute of limitations (i.e., the one applicable in that jurisdiction), would in some cases be barred from refiling in New Hampshire.

Courts that have addressed this issue under analogous savings statutes are divided.  A slim majority of courts have ruled that whether the first action was timely filed is determined by the statute of limitations applicable in the forum state of the second suit, not that of the original jurisdiction. See, e.g., Gauthier v. United States, Civ. No. 4:10-40116-FDS, 2011 WL 3902770, at *6 (D. Mass. Sept. 2, 2011) (Massachusetts law); Gurfein v. Sovereign Grp., 826 F. Supp. 890, 917 (E.D. Pa. 1993) (Pennsylvania law).[5]  A minority of courts have ruled to the contrary, holding that, under the savings statute at issue,

---

[5] See also Malone v. Bankhead Enters., Inc., 125 F.3d 535, 538 (7th Cir. 1997) (Illinois law); Allen, 656 F.2d at 423-24 (Montana law); Deluca v. Atl. Ref. Co., 176 F.2d 421, 422 (2d Cir. 1949) (New York law); LaBarge, 751 F. Supp. at 811 (Arkansas law).  Several other courts have expressed in dicta that they would interpret the savings statutes at issue in the same way.  See Jones v. Mid Am. Expositions, Inc., 708 F. Supp. 173, 176-77 (S.D. Ohio 1989) (Georgia law); Pearcy, 617 F.2d at 45 (West Virginia law).

the first action must be timely filed according to the law applicable in the jurisdiction where that first action was filed.  See Harrell v. G4S Secure Solutions (USA), Inc., No. 8:13CV247, 2014 WL 12059003, at *3-4 (D. Neb. Feb. 11, 2014) (New Mexico law); King v. Nashua Corp., 587 F. Supp. 417, 418 (E.D. Mo. 1984) (Missouri law), aff'd, 763 F.2d 332 (8th Cir. 1985); Campbell v. Hubbard, 201 P.3d 702, 706 (Kan. Ct. App. 2008) (Kansas law); Berntsen v. Coopers & Lybrand, L.L.P., 623 N.W.2d 843, 847 (Iowa 2001) (Iowa law).

One of the main policy justifications underlying the minority interpretation is that it accords with the reasonable expectations of a plaintiff acting in good faith.  See Harrell, 2014 WL 12059003, at *3; Campbell, 201 P.3d at 705.  For example, a plaintiff who files a diversity suit in New Jersey District Court would expect that that court would apply New Jersey's statute of limitations or New Jersey's choice-of-law rules to determine the applicable statute of limitations.  See 17A Moore's Federal Practice - Civil § 124.01(3) (2018) (federal district court sitting in diversity "must apply the state substantive law in which the district court is located . . . . includ[ing] the forum state's choice of law rules").  The plaintiff would likely rely on that expectation in determining the time limits for filing in that jurisdiction.  Under the

minority view, if the original suit is dismissed for reasons other than on the merits (e.g., for lack of personal jurisdiction), that plaintiff could still have her day in court in New Hampshire so long as the first action was timely filed under the law applicable in New Jersey District Court.  On the other hand, under the majority view, the same plaintiff would be denied her day in court if she happened to timely file her first suit according to the law applicable in New Jersey but after the running of the statute of limitations applicable in New Hampshire, the second forum jurisdiction.  The outcome under the minority interpretation is more consistent with the purpose of the New Hampshire savings statute because it ensures even clumsy or mistaken plaintiffs a day in court.  See Roberts, 140 N.H. at 725; Milford, 78 N.H. at 178.

The primary concern of courts adopting the majority interpretation is the specter of forum shopping.  These courts worry that plaintiffs will use savings statutes to circumvent local statutes of limitations by filing their first suit in a jurisdiction with a longer limitations period.  See, e.g., Gauthier, 2011 WL 3902770, at *6; Gurfein, 826 F. Supp. at 917. Even assuming that the minority interpretation facilitates forum shopping to some degree, the policy against forum shopping may be outweighed by the right of access to the courts by diligent

plaintiffs.  Cf. Burnett, 380 U.S. at 428 (observing that the policy underlying statutes of limitations—protection of defendants—"is frequently outweighed, however, where the interests of justice require vindication of the plaintiff's rights").

In this case, forum shopping is a non-issue.  There is no evidence in the record that Vanz intended to circumvent New Hampshire's shorter statute of limitations by filing in New Jersey.  Indeed, New Jersey is Vanz's principal place of business, making it a desirable forum.  See Roy v. North Am. Newspaper Alliance, Inc., 106 N.H. 92, 97 (1964) (noting that plaintiff was not "forum shopping" by seeking redress in community and state where he lived and worked).  For all the reasons discussed above, this court concludes that the New Hampshire Supreme Court would interpret RSA 508:10 consistent with the minority view: as requiring that the first suit be timely filed according to the law applicable in the jurisdiction in which it was filed.

Applying this interpretation of RSA 508:10 to this case, the question becomes what statute of limitations would have applied in the New Jersey District Court to determine whether the claims in Vanz's first suit were timely filed there.  The four-year limitations period for RICO claims is set by federal

law, so it would apply equally in New Jersey as here.  See Rotella, 528 U.S. at 553.  All Vanz's other claims in that first action were state law claims brought under New Jersey law.  See doc. no. 21-19.  Accordingly, the New Jersey District Court would have applied New Jersey's six-year statute of limitations for personal actions to determine whether those claims were timely filed.  See N.J. Stat. Ann. § 2A:14-1; see also 17A Moore's Fed. Practice - Civil § 124.01(3) (2018) (federal district court sitting in diversity "must apply the state substantive law in which the district court is located").

Vanz's purchase of the Chase portfolio occurred in October 2011 and Vanz discovered PMD's alleged wrongdoing in January or February 2012.  Assuming without deciding that the discovery rule applies to RICO claims, Vanz's RICO claim in the New Jersey suit, commenced in December 2015, was timely.[6]  Vanz's other claims filed in December 2015 were also timely.  See N.J. Stat. Ann. § 2A:14-1.  Therefore, all Vanz's claims in the first action were "brought within the time limited therefor" under RSA 508:10.

_____

[6] Because the court grants summary judgment to defendants on Vanz's RICO claim for other reasons discussed below, the court assumes this proposition in Vanz's favor.  See Rotella, 528 U.S. at 554 n.2 (reserving the question of whether injury-discovery rule applies to RICO claims).

## 2. First action not decided on the merits

The second requirement of the savings statute is that the first action must have been "dismissed for reasons not barring the right of action or determining it upon its merits." Berg, 134 N.H. at 257 (internal quotation marks omitted). PMD does not dispute that this requirement is met here. See doc. no. 21-1 at 5; Berg, 134 N.H. at 258-59 (observing that dismissal for lack of jurisdiction is not a judgment on the merits).

## 3. Second suit filed within one year of dismissal of first

Third, RSA 508:10 requires that the second suit be filed within one year of the dismissal of the first action. RSA 508:10. PMD does not dispute that Vanz's second suit, filed here in April 2017, was filed within one year of the June 2016 dismissal of the suit against it in New Jersey District Court. See doc. no. 21-1 at 5.

## 4. Same defendants as first action

Next, the New Hampshire Supreme Court has interpreted RSA 508:10 as requiring that the second suit be brought against the same defendant or defendants as the first action. Rowe, 130 N.H. at 23-24; see also Veale, 1999 WL 525941, at *1. Given this authority, Vanz concedes that the individual defendants

27

named in this case—Arsenault, Whitney, and Gigante—"are entitled to summary judgment because [Vanz] did not name them as defendants in the prior lawsuit in New Jersey." Doc. no. 28-1 at 20. The court, therefore, grants summary judgment to Arsenault, Whitney, and Gigante as to all claims asserted against them individually (Counts I-II, IV-VII). The only remaining defendant is PMD. The court proceeds to consider application of the fifth and final requirement of the savings statute to Vanz's claims against PMD.

### 5. Same claims as first action

The fifth and final requirement of the savings statute is that the second suit be composed of the same claims as the first. See Moulton-Garland, 143 N.H. at 543-44; Milford Q. & C. Co., 78 N.H. at 177; see also Prince, 2010 WL 988730, at *9. After examining the amended complaint in the New Jersey action, the court concludes that Vanz raised only one claim of fraud against PMD in that first action. Vanz is therefore limited to raising that one claim in this second suit.

The original New Jersey complaint alleged nine counts against Mattia, Mattia's president, and its chief operating officer arising out of Mattia's sale of three portfolios of nonperforming debt to Vanz—one of which was the Chase portfolio.

See doc. no. 21-18.  Vanz's amended complaint in that action added PMD as a defendant.  The amended complaint alleged the same nine counts as the original complaint, but only Count I, alleging fraud arising out of the sale of the Chase portfolio, was asserted against PMD.  Compare doc. no. 21-18, with doc. no. 21-19.  Because Vanz alleged only a fraud claim against PMD in its first suit in New Jersey, under RSA 508:10, its second suit against PMD is limited to that one claim.  See Prince, 2010 WL 988730, at *9.  Put differently, Vanz is precluded from raising any other, new claims in this second suit against PMD that were not raised in the New Jersey action.

In an attempt to save its RICO claim against PMD, Vanz contends that its amended complaint in the New Jersey action alleged a RICO claim against PMD.  Doc. nos. 28-1 at 24, 33 at 9.  Vanz argues that it asserted a RICO claim against PMD because the RICO claim in the New Jersey action requested judgment generically against "the Defendants."  Doc. no. 28-1 at 24.  The court is not persuaded.

It is true that Count VIII of the amended complaint in the New Jersey action asserts a RICO violation and requests judgment against "the Defendants."  Doc. no. 21-19 at 12-15.  However, reading the language of Count VIII in the context of the complaint, it is evident that Vanz asserted that claim against

only Mattia and its two individual principals. For example, the complaint states that Count VIII is alleged by Vanz "against Defendants, Mattia and Associates, George Mattia and Craig M. Geisler, under the Organized Crime Control Action of 1970, Racketeer Influenced and Corrupt Organizations [Act]." Id. at 12. The allegations in Count VIII repeatedly use the phrase "Defendants, Mattia and Associates, George Mattia and Craig M. Geisler." See id. at 12-15. Although the amended complaint also uses the generic term "Defendants" throughout, PMD is not mentioned in Count VIII. PMD is expressly referenced in only one claim, Count I (fraud). See generally doc. no. 21-19. Thus, the court interprets the amended complaint in the New Jersey action as alleging a RICO claim against only Mattia and its principals, not PMD.

In sum, Vanz may rely upon RSA 508:10 to assert claims in this second suit only if it also asserted those claims against PMD in the first action. Only PMD's fraud claim, Count I in this action, meets this requirement. Vanz's other claims against PMD (Counts II-VI) do not meet the requirements of RSA 508:10, and are therefore barred by the applicable statutes of limitations as described above. See Prince, 2010 WL 988730, at *9. Accordingly, PMD is entitled to summary judgment on Counts II through VI. This leaves only one remaining claim: Vanz's

fraud claim against PMD.  PMD moves for summary judgment on this claim, arguing that there is insufficient evidence of fraud to get to the jury.

B.  Merits of Fraud Claim

Vanz maintains that PMD committed fraud by representing to Mattia that the face value of the Chase portfolio was approximately $21.4 million, when it was actually $15.8 million, and that Mattia, in turn, communicated that misrepresentation to Vanz.  Vanz contends that PMD knew that the face value of the portfolio represented to Vanz was inaccurate because PMD had inflated the value of the portfolio by including post-charge-off interest.  Vanz further alleges that it relied upon this misrepresentation in agreeing to purchase the portfolio for the stated price.

"The essence of fraud is a fraudulent misrepresentation." Jay Edwards, Inc. v. Baker, 130 N.H. 41, 46 (1987).  To prove fraud, a plaintiff must establish that the defendant made a misrepresentation and that the misrepresentation was "made with knowledge of its falsity or with conscious indifference to its truth with the intention of causing another person to rely on the representation."  Tessier v. Rockefeller, 162 N.H. 324, 332 (2011)(internal quotation marks omitted); see also Sykes v. RBS

Citizens, N.A., 2 F. Supp. 2d 128, 147 (D.N.H. 2014).  A

plaintiff must also show that it justifiably relied upon the

defendant's representation.  See Tessier, 162 N.H. at 332;

Caledonia, Inc. v. Trainor, 123 N.H. 116, 124 (1983).

The central misrepresentation at issue here is PMD's

written statement in its purchase and sale agreement with Mattia

that the face value of the Chase portfolio was approximately

$21.4 million.[7]  As a threshold matter, PMD argues that Vanz's

fraud claim must fail because this representation was not made

directly from PMD to Vanz.  Doc. no. 21-1 at 15.  However, the

New Hampshire Supreme Court has held, relying upon the

Restatement (Second) of Torts, that "[t]he fact that the alleged

misrepresentation was not made directly to the plaintiff does

not defeat her cause of action."  Tessier, 162 N.H. at 333.  In

so doing, the Court adopted the Restatement rule:

> The maker of a fraudulent misrepresentation is subject
> to liability for pecuniary loss to another who acts in
> justifiable reliance upon it if the misrepresentation,
> although not made directly to the other, is made to a
> third person and the maker intends or has reason to
> expect that its terms will be repeated or its
> substance communicated to the other, and that it will
> influence his conduct in the transaction . . .
> involved.

---

[7] Vanz also relies upon similar oral representations made by
PMD to Mattia that were orally repeated to Vanz as the basis of
its fraudulent misrepresentation claim.  See doc. no. 28-1 at
12.  Because the court concludes that there is sufficient
evidence to survive summary judgment based on the written
representation, it need not address the oral representations.

_Id._ (quoting _Restatement (Second) Torts_ § 533, at 72-73). This rule "is applicable not only when the effect of the misrepresentation is to induce the other to enter into a transaction with the maker, but also when he is induced to enter into a transaction with a third person." _Restatement (Second) Torts_ § 533, cmt. c; _see also id._ § 532 (providing that fraudulent misrepresentation claim may be based on misrepresentation made in a negotiable instrument or similar commercial document where third person or person dealing directly with defendant justifiably relies upon truth of representations in document).

Here, PMD represented in its purchase and sale agreement with Mattia that the face value of the Chase portfolio was $21.4 million. Doc. no. 28-3 at 2, 11. PMD was aware at the time of that transaction that Mattia intended to sell the portfolio to Vanz. _See_ doc. no. 21-10 at 20 (Mesce's deposition testimony describing phone call between himself, Arsenault, and Mattia representative regarding sale of Chase portfolio).[8] PMD therefore had reason to expect that its representation of the

_____

[8] Arsenault disputes that he participated in this call. Doc. no. 28-9 at 31. However, on summary judgment, the court construes the facts in the light most favorable to the nonmoving party, Vanz. _See_ _Block Island Fishing, Inc. v. Rogers_, 844 F.3d 358, 360 (1st Cir. 2016).

face value of the portfolio would be repeated to a third party
(Vanz).  PMD also had reason to expect that its representation
would influence the conduct of that third party because the face
value of a portfolio is an important factor in evaluating its
desirability.  <u>See</u> doc. no. 28-2 at 11.  Thus, PMD's
representation of the face value of the portfolio to Mattia,
that was later repeated to Vanz, may serve as the fraudulent
misrepresentation at issue, though not made directly to Vanz.

Focusing on this misrepresentation, there is evidence from
which a reasonable jury could conclude that PMD's representation
that the face value of the Chase portfolio was $21.4 million was
false and that PMD made that representation with knowledge of
its falsity or conscious indifference as to its truth.  PMD's
purchase and sale agreement with Mattia represented that the
face value of the Chase portfolio was $21.4 million.  To be more
precise, that agreement represented that the portfolio had "an
aggregate Current Balance" of $21.4 million.  Doc. no. 28-3 at
2.  The agreement described "current balance" as meaning: "as to
any Account <u>at the time of charge-off</u>, the total current unpaid
balance due and owing, less payments subsequently received, as
shown on Seller's books and records."  <u>Id.</u> (emphasis added).
Thus, the "aggregate Current Balance" was the total of all the

current balances of the individual accounts in the portfolio, or the face value of the portfolio.

By defining "current balance" as the current unpaid balance of an individual account <u>at the time of charge-off</u>, the agreement impliedly represented that post-charge-off interest was not included in either the "current balance" of each account or the aggregate current balance of the portfolio. <u>Cf</u>. doc. no. 28-2 at 14 (describing "post-charge-off interest" as interest that is added to individual account balances <u>after</u> the original creditor has charged-off the debt). Consequently, PMD's purchase and sale agreement with Mattia represented that the $21.4 million figure did not include post-charge-off interest. Mattia's purchase and sale agreement with Vanz repeated these very same statements. Doc. no. 28-4 at 2-3, 11.

Contrary to these statements, there is evidence that post-charge-off interest was, in fact, included in the $21.4 million face value amount. First, Mesce attested that, upon comparing the spreadsheet Vanz was given at closing with the bank's charge-off statements, it was evident that post-charge-off interest had been added to all the individual accounts. Doc. no. 28-2 at 13-14. Second, Mattia sent an email to PMD regarding post-charge-off interest in the Chase portfolio. <u>See</u> doc. no. 28-17 at 22. In that email, Mattia asserted that the

Chase portfolio included post-charge-off interest and stated that "[w]e have a BIG problem with this, as we were told there isn't POST charge off interest." Id. The email also asserted that "[t]his is not how we sold this file." Id.

Finally, there is evidence of an unexplained change in the face value of the Chase portfolio between the time PMD purchased it from NCA and resold it to Mattia nine days later. Arsenault testified in his deposition that the face value of the Chase portfolio was approximately $15.8 million when PMD bought it from NCA. Doc. no. 28-9 at 34. He further testified that PMD then turned around and represented to Mattia that the face value of the portfolio was approximately $21.4 million. Id. at 35. He clarified that PMD sold the exact same Chase portfolio to Mattia that it had received from NCA, making no changes to it. Id. at 22-23. When asked how the face value of the Chase portfolio grew by approximately $5.6 million when the transactions occurred approximately one week apart, Arsenault replied "I bought it off [at] one price, and I sold it for another." Id. at 36.

In light of industry terminology, however, this statement does not explain how the face value of the portfolio grew substantially. The price of a portfolio is typically calculated as a percentage of the portfolio's face value. Doc. no. 28-2 at

36

10.  The percentage of the face value a debt buyer is willing to pay may vary depending on the characteristics of the portfolio. Id. at 10-11.  Though that percentage, and consequently the price a buyer is willing to pay, may change, the face value of the portfolio does not; it is fixed, unless accounts are added to or subtracted from the portfolio.  See id. at 10-12.  These facts leave unexplained how the face value of the portfolio increased dramatically in about one week.  Considering all this evidence together, a jury could reasonably conclude that PMD included post-charge-off interest in the portfolio to reach the $21.4 million figure, contrary to the representations in the purchase and sale agreement, and that PMD knew that those representations were false.

There is also evidence that PMD intended that others would rely upon the misrepresentation of the portfolio's face value. In the debt-buying industry, a portfolio's face value is "one of the most important factors which the debt buyer takes into consideration when deciding the price he is willing to pay for a given portfolio."  Doc. no. 28-2 at 11.  It is also common practice in the industry, as evidenced by this case, that the same portfolio be bought and resold among multiple buyers and sellers.  See doc. no. 28-21 at 41-43.  Thus, the context of the case gives rise to a reasonable inference that PMD knew that the

misrepresentation would be repeated and intended that a third-party buyer further down the chain of title would rely upon it.

Finally, there is evidence from which a reasonable jury could conclude that Vanz justifiably relied upon the misrepresentation in PMD's agreement with Mattia that was repeated to Vanz. A plaintiff's reliance is justifiable where the matter misrepresented by the defendant is material. Tessier, 162 N.H. at 333. A misrepresentation is material when a reasonable person "would attach importance to its existence or nonexistence in determining his [or her] choice of action in the transaction in question." Id. (quoting Restatement (Second) Torts § 538 at 80).[9] As explained above, the face value of a portfolio is an important factor in determining its purchase price and, consequently, a company's willingness to buy the portfolio. Therefore, a jury could reasonably conclude that the face value of a portfolio of nonperforming debt would be a material fact to Vanz and that Vanz's reliance upon it was justifiable.

---

[9] Under the Restatement (Second) of Torts, upon which the New Hampshire Supreme Court has heavily relied, see, e.g., Tessier, 162 N.H. at 333-34, there is no duty on the part of the plaintiff to investigate the truth or falsity of the representation at issue, see Restatement (Second) Torts § 540 (plaintiff is justified in relying upon truth of fraudulent misrepresentation "although he might have ascertained the falsity of the representation had he made an investigation").

In sum, construing all facts and reasonable inferences in Vanz's favor, the court concludes that there is sufficient evidence for Vanz's fraud claim to survive summary judgment.

## CONCLUSION

For the foregoing reasons, defendants' motion to strike (doc. no. 31) is granted to the limited extent that, in ruling on the motion for summary judgment, the court has disregarded Craig Geisler's deposition testimony, any assertions in Mesce's affidavit that would be inadmissible at trial, and any assertions in the opposition memo that are purely speculative and/or not supported by the record; the motion is otherwise denied.  The court grants summary judgment to all the individual defendants (Arsenault, Whitney, and Gigante) on all claims asserted against them (Counts I-II, IV-VII).  The court grants summary judgment to PMD on Counts II through VI against it, but denies summary judgment as to Count I (fraud).

SO ORDERED.

_____
Landya McCafferty
United States District Judge

March 28, 2019

cc:  Counsel of Record